Alexander F. MacKinnon (SBN 146883)
Email: alexander.mackinnon@kirkland.com
Terry Huang (SBN 253691)
Email: terry.huang@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500

Attorneys for Plaintiffs
3M Innovative Properties Company, 3M
Unitek Corporation,
and 3M Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY, a Delaware corporation, 3M UNITEK CORPORATION, a California corporation, and 3M COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>TP ORTHODONTICS, INC., an Indiana corporation,<br><br>Defendant. | CASE NO. CV10-521 RSWL (JCx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE CONSENT JUDGMENT**<br><br>Judge: Hon. Ronald S.W. Lew<br><br>Hearing Date: January 4, 2011<br>Time: 10:00 a.m.<br>Courtroom: 21 |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ....................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 2

    A. The Consent Judgment Order Permanently Enjoins TPO From Infringing the '154 Patent ................................................................. 2

    B. TPO Is In Violation of the Consent Judgment Order ....................... 2

III. THE COURT SHOULD FIND TPO IN CONTEMPT OF THE CONSENT JUDGMENT ORDER ............................................................. 3

    A. In the Consent Judgment, TPO Admitted That the Previous InVu Kit Infringed the '154 Patent ............................................................. 3

        1. The Invention of the '154 Patent ............................................. 3

        2. The Original Infringing InVu Kit ............................................ 5

    B. TPO's Current InVu Kit Is Only Colorably Different From the Infringing Kit .................................................................................... 5

    C. The Current InVu Kit Still Infringes the '154 Patent ........................ 7

IV. THE COURT SHOULD ENFORCE THE CONSENT JUDGMENT ORDER AGAINST TPO AND AWARD APPROPRIATE SANCTIONS . 10

    A. TPO Should Be Ordered to Comply With the Provisions of the Injunction in the Consent Judgment Order ..................................... 10

    B. TPO Should Be Monetarily Sanctioned and Should Pay 3M's Fees and Costs in Enforcing the Consent Judgment ................................ 10

V. CONCLUSION .......................................................................................... 11

Case 2:10-cv-00521-RSWL-JC   Document 17   Filed 12/03/10   Page 3 of 14   Page ID #:71

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
  334 F.3d 1294 (Fed. Cir. 2003) .................................................................... 4

*General Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) .................................................................... 10

*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999) .................................................................. 4, 9

*KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*,
  776 F.2d 1522 (Fed. Cir. 1985) .................................................................... 3

*Reno Air Racing Ass'n v. McCord*,
  452 F.3d 1126 (9th Cir. 2006) ...................................................................... 3

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ...................................................................... 9

*Teleflex, Inc. v. Ficosa North Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ............................................................ 4, 8, 9

*Whittaker Corp. v. Execuair Corp.*,
  953 F.2d 510 (9th Cir. 1992) ...................................................................... 10

*York Prods., Inc. v. Central Tractor Farm & Family Ctr.*,
  99 F.3d 1568 (Fed. Cir. 1996) ...................................................................... 4

ii

## I.    INTRODUCTION

Plaintiffs 3M Innovative Properties Company, 3M Unitek Corporation, and 3M Company (collectively "3M") move for an order finding that Defendant TP Orthodontics, Inc. ("TPO") is in violation of the Consent Judgment Order entered by this Court on May 13, 2010 by manufacturing, offering for sale, and selling articles that infringe U.S. Patent No. 5,348,154 ("the '154 patent"). The Court's May 13, 2010 Consent Judgment Order permanently enjoined TPO from making, using, offering to sell, selling, or importing into the United States any articles that infringe the '154 patent. (*See* D.I. 14.)

While TPO has made some minor changes to the packaging of its InVu with Readi-Base Pre-Applied Adhesive kit (the "InVu kit") for orthodontic appliances, the current InVu kit continues to infringe the '154 patent in violation of the Consent Judgment Order. TPO itself concedes that its current kits include the vast majority of the claim elements of the '154 patent. In essence, TPO's position comes down to an assertion that the term "hole" in the '154 claims is not simply a hollow depression or empty space as plain English provides. TPO's attempt to avoid infringement by adding limitations to this straightforward word in the claims should be rejected, and its violation of the Consent Judgment should be stopped. 3M has tried to resolve this matter with TPO, but TPO refuses to cease sales of and recall the current InVu kit.

Accordingly, 3M seeks an order (i) finding that TPO's current InVu kit infringes the '154 patent and violates the Consent Judgment Order; (ii) requiring TPO to cease all manufacture and sales of the current InVu kit and to recall the infringing kits; (iii) awarding 3M the revenue earned by TPO from the sales of the current InVu kit; and (iv) pursuant to the express provision of the Consent Judgment Order, awarding 3M its fees and costs in bringing this motion.

## II. FACTUAL BACKGROUND

### A. The Consent Judgment Order Permanently Enjoins TPO From Infringing the '154 Patent

On January 26, 2010, 3M filed a complaint for patent infringement against TPO alleging infringement by TPO's InVu kit. (*See* D.I. 1.) In response, TPO admitted that its InVu kit met each and every element of the claims of the '154 patent, agreed that it would not challenge the validity of the '154 patent, and conceded that TPO had infringed the '154 patent. (*See* D.I. 14, at ¶¶ 3, 5-6.) TPO also agreed to a Consent Judgment permanently enjoining it from further infringement of the '154 patent, including "making, using, offering to sell, selling, or importing into the United States any articles that infringe the '154 patent." (*See id.*, at ¶ 4.) This Court entered the Consent Judgment Order on May 13, 2010.

### B. TPO Is In Violation of the Consent Judgment Order

TPO has reintroduced its InVu kit into the market. The current kit includes superficial packaging differences from the previous InVu kit, but fails to incorporate any meaningful changes to avoid infringement of the '154 patent. The material features of the infringing InVu kit are repeated in the current version. Consequently, by manufacturing and selling the current InVu kit, TPO is again infringing the '154 patent in violation of the Court's Consent Judgment Order.

Counsel for 3M met and conferred with counsel for TPO on November 15, 2010 regarding the substance of this motion. Counsel for the parties further conferred on November 23 and November 29, but were unable to resolve the dispute because TPO refused to change to a noninfringing kit and refused to cease sales of and recall its current InVu kit. While it concedes that the current InVu kit includes most of the elements of the '154 patent, TPO takes the position that this version of the kit does not have at least two "holes" as required by the claims of the '154 patent and that the individual substrates or pods in the kit are not "removably retained" by holes. TPO's argument ignores the plain and ordinary meaning of the word "hole" and improperly

imports limitations from the preferred embodiment into the claims. As shown in Section III below, the current InVu kit plainly has multiple "holes" when that non-technical term is given its standard English meaning of an unoccupied space or hollow depression.[1] Moreover, there is no dispute that the pods in the current InVu kit can be removed and replaced in the kit, and thus are removably retained as required by the claims of the '154 patent.

### III. THE COURT SHOULD FIND TPO IN CONTEMPT OF THE CONSENT JUDGMENT ORDER

Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). A contempt proceeding is proper if the prior infringing devices and the modified devices merely have "colorable" differences between them. *KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1530, 1532 (Fed. Cir. 1985). A finding that a modified device falls within the admitted or adjudicated scope of a patent's claims supports a judgment of contempt. *See id.* at 1530.

For its failure to comply with the Consent Judgment Order, and for violating the permanent injunction contained therein, the Court should hold TPO in contempt, should compel TPO to comply with the Order, and should sanction TPO appropriately.

#### A. In the Consent Judgment, TPO Admitted That the Previous InVu Kit Infringed the '154 Patent

##### 1. The Invention of the '154 Patent

The '154 patent is directed to orthodontic or dental appliances that are coated with light-curable or tacky materials and the packaging of these appliances. The patent also discloses a kit with a tray-based package designed to provide convenient

---

[1] According to the Oxford American Dictionary, a hole is "an empty place in a solid body or mass, a sunken place on a surface." (*See* Declaration of Terry Huang, Ex. A, Oxford American Dictionary 311 (1980).)

3

organization and storage of sets of appliances. This packaging prevents early curing of the pre-coated appliances and maximizes ease of use by orthodontic and dental practitioners. (*See* Huang Decl., Ex. B, 5/3/1993 Amendment, at 4.)

Claim 1 of the '154 patent provides as follows:

An article comprising:

  (a) a tray having at least two holes;

  (b) at least two substrates each having a top surface and a single well opening only at the top surface and being removably retained in one of the holes in the tray;

  (c) a lid releasably attached to the top surface so as to cover the well opening in a manner such that the substrate is removable from the hole with the lid attached to the top surface thereof;

  (d) an orthodontic appliance having a tacky substance on an exterior surface thereof that is positioned in the well such that the tacky substance does not separate from the appliance upon removal from the well.

The term "hole" as used in the '154 patent is a standard English word that does not have a special definition in the specification or in the prosecution history. "Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996); *see also Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003). "[A] court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *accord Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

Here, the '154 patent does not reflect an intent to limit its claims to a specialized or novel meaning of the word "hole." Thus, "hole" has its plain and ordinary meaning: an unoccupied space or hollow depression, which in this instance

4

accommodates a substrate.

### 2. The Original Infringing InVu Kit

In the Consent Judgment, TPO admitted that the original version of the InVu kit met each and every limitation of Claim 1, as well as the rest of the claims of the '154 patent. (*See* D.I. 14, at ¶ 3.) That kit was a cardboard paper tray box with twenty-eight square cut-outs with hollow spaces or holes beneath the cut-outs, and each hole corresponded to a tooth on the human jaw. *See* Declaration of Michael R. Lane, at ¶¶ 4-5. The kit included plastic substrates or pods that fit into each hole, so that the body of the pods extended into the hollow space of the tray. *See id.*, at ¶ 6. The pods could be removed from the tray, but prior to removal were retained in the tray through the close fitting of the hole edges to the circumference of the pods. *See id.* Each pod contained a metalized plastic lid that sealed its top surface and remained on the pod when it was removed from the tray. *See id.*, at ¶ 7. Lastly, each pod contained an orthodontic bracket that was coated with a tacky substance that remained on the bracket when it was removed from the pod's well. *See id.*, at ¶¶ 8-9.

### B. TPO's Current InVu Kit Is Only Colorably Different From the Infringing Kit

After entry of the Consent Judgment Order, TPO made minor changes to its InVu kit, but these changes do not avoid infringement of the '154 patent:

(1) The tray is now made of plastic instead of cardboard paper. *See id.*, at ¶ 15. The claims of the '154 patent, however, are not limited to any specific material. *See* '154 patent, Claim 1(a).

(2) The InVu pods have no discernible changes. *See id.*, at ¶ 19. They still include a lid on top of a well, and they still contain an orthodontic appliance with a tacky substance on an exterior surface that is not separated from the appliance when the appliance is removed from the well. *See id.*, at ¶¶ 7-9, 19. Consequently, they infringe the '154 patent in the same way that the previous pods did.

5

(3)  Instead of having cut-outs in the top layer of the tray that allow the pods to descend into a hollow space or hole, the tray is itself indented to form multiple hollow spaces or holes.  *See* Lane Decl., at ¶ 15.  The sides of the holes of the current InVu kit are further defined by ridges that establish individual holes for each pod.  *See id.*, at ¶¶ 15-16.

(4)  Sticky material has been applied to the bottom surface of the holes to assist in retaining individual pods, which can still be removed.  *See id.*, at ¶ 18.  In addition, the ridges between the holes assist in retaining the pods.  *See id.*, at ¶ 16.

A table comparing the previous and current InVu kits is provided below.

| CLAIMED ELEMENT | PREVIOUS INVU KIT | CURRENT INVU KIT |
| --- | --- | --- |
| "a tray having at least two holes" | The previous InVu kit included a hollow paper tray.  *See* Lane Decl., at ¶ 4.  Square cut-outs in the top surface of the paper tray allowed pods to be inserted through the cut-outs into the hollow space or holes between the top and bottom surface.  The tray contained twenty-eight holes.  *See id.*, at ¶¶ 4-6. | The current InVu kit includes a plastic tray.  *See id.*, at ¶ 15.  The tray contains two elongated empty or hollow spaces with ridges that form separate holes into which pods are inserted.  *See id.*, at ¶¶ 15-16.  The tray contains twenty-eight holes.  *See id.*, at ¶ 16. |
| "substrates ... being removably retained in one of the holes in the tray" | The substrates or pods of the previous InVu kits were removable from the tray.  *See id.*, at ¶ 6.  Prior to removal by the user, the tray retained the pods in each hole by closely fitting the edges of the cut-out to the circumference of the pod.  *See id.*, at ¶ 6.  After removal, the pods could be replaced back into the holes.  *See id.* | The substrates or pods of the current InVu kit are removable from the tray.  *See id.*, at ¶ 18.  Prior to removal by the user, the pods are retained in each hole by the ridges defining the individual holes and by use of a sticky material applied to the bottom surface of each hole.  *See id.*, at ¶¶ 16-18.  The pods can be replaced back into the holes.  *See id.*, at ¶ 18. |
| "a lid releasably attached to the top surface" (of the substrate) | Each substrate or pod of the previous InVu kit contained a metalized plastic lid fully covering and attached to the top surface of the pod.  *See id.*, at ¶ 7.  The lid could be peeled off of the pod to expose its contents. | The lids of the substrates or pods of the current InVu kit are <u>identical</u> to the previous InVu kit.  *See id.*, at ¶ 19. |

| | | |
|---|---|---|
| | *See id.*, at ¶ 8. | |
| "an orthodontic appliance having a tacky substance on an exterior surface thereof" | Each substrate or pod of the previous InVu kit contained an orthodontic bracket. *See id.*, at ¶ 8. The bottom of each bracket was coated with a tacky substance that remained attached to the bracket once removed from the pod's well. *See id.*, at ¶ 9. | The orthodontic appliances of the current InVu kit are identical to the previous InVu kit. *See id.*, at ¶ 19. |

### C. The Current InVu Kit Still Infringes the '154 Patent

The packaging changes made to the InVu kit are superficial, and the current kit still meets each and every limitation of independent Claim 1 of the '154 patent, as shown in the below claim chart.

| CLAIM LANGUAGE | CURRENT INVU KIT |
|---|---|
| 1. An article comprising: | The current InVu kit is an article. |
| (a) a tray having at least two holes; | The current InVu kit includes a plastic tray having twenty-eight holes located in two elongated empty or hollow spaces. *See id.*, at ¶¶ 15-16. Each of the twenty-eight holes corresponds to a tooth on the human jaw. *See id.*, at ¶ 16. |
| (b) at least two substrates each having a top surface and a single well opening only at the top surface and being removably retained in one of the holes in the tray; | The current InVu kit contains plastic substrates or pods fitted into several of the tray holes. *See id.*, at ¶¶ 6-8, 19. When inserted into the tray, the top surfaces of the pods are flat along the surface of the tray, but the pods contain wells that protrude into the holes of the tray. *See id.*, at ¶ 17. The pods are held in place by the ridges defining each hole and by use of a sticky material applied to the bottom surface of the hole. *See id.*, at ¶¶ 16-18. The pods can be removed from the tray and replaced back into the tray. *See id*, at ¶ 18. |
| (c) a lid releasably attached to the top surface so as to cover the well opening in a manner such that the substrate is removable from the hole | Each substrate or pod of the current InVu kit contains a metalized plastic lid attached to its top surface. *See id.*, at ¶¶ 7, 19. The plastic lid covers the entire top |

7

| CLAIM LANGUAGE | CURRENT INVU KIT |
|---|---|
| with the lid attached to the top surface thereof; | surface and well opening of each pod, but not any portion of the tray; thus, when the pod is removed from the tray, the lid is removed with it. *See id.* Furthermore, the lid can be peeled away from the top surface of the pod to expose the contents of its well. *See id.*, at ¶¶ 8, 19. |
| (d) an orthodontic appliance having a tacky substance on an exterior surface thereof that is positioned in the well such that the tacky substance does not separate from the appliance upon removal from the well. | Each substrate or pod contains an orthodontic bracket. *See id.*, at ¶¶ 8, 19. The bottom of each bracket is coated with a tacky substance that plastically deforms when touched. *See id.*, at ¶¶ 9, 19. The bracket is positioned in the well using a long-axis indicator that rests in grooves along the top edge of the well and is held in place by the lid (when sealed shut). *See id.*, at ¶¶ 8, 19. When a bracket is removed from a well, the tacky substance remains attached to the bracket. *See id.*, at ¶¶ 9, 19. |

In communications between counsel prior to this motion, TPO has not contested that the current InVu kit includes the vast majority of the elements of the claims of the '154 patent, just as the prior kit did. Instead, TPO's noninfringement position comes down to an argument about what a "hole" is. TPO has taken the position that even though the hollow spaces in the current InVu kit plainly have the common attributes of "holes," they supposedly should not be deemed "holes" under the patent claims because the ends of the hollow troughs in the kit are open and lack a continuous "rim." By making this argument, TPO improperly attempts to add extraneous requirements to the claim term "holes" that go beyond its plain meaning. The Federal Circuit has repeatedly rejected similar attempts by infringers to add qualifying language to clear and unambiguous claim terms. *See, e.g.*, *Teleflex*, 299 F.3d at 1327 ("[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history.").

Rather than redesign its kits to avoid the fundamental elements of the '154 patent, TPO continues to use the invention of the patent in its InVu kits, and in doing so, violates the Consent Judgment. Indeed, the open-ended spaces in the current InVu kit are still hollow depressions that accommodate pods, and thus satisfy the plain and ordinary meaning of "hole." The ridges formed along the sides of the holes further define and limit individual holes for each pod. Consequently, each pod fits into a corresponding "hole" as claimed in the '154 patent. TPO cannot overcome the "heavy presumption" in favor of the ordinary meaning of the term "hole," given that the written description of the '154 patent does not contain any statements that confine or otherwise affect the scope of the term. *See Johnson*, 175 F.3d 989-90.

In the pre-motion meet and confers, TPO also took the position that the pods in the current InVu kit are not "removably retained" because sticky material on the bottom surface of the holes aids in the retention of the pods. That argument, however, is wrong as a matter of law. The '154 patent claims do not require a particular way for the substrate or pod to be removably retained. To require that an article can infringe the '154 patent only when the edges of a hole fully encircle and grip the body of an inserted pod—as TPO now urges—would improperly read a preferred embodiment into the claims. *See, e.g.*, *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."); *see also Teleflex*, 299 F.3d at 1326-27 (holding that even where only one embodiment is disclosed in the specification, claim terms are not necessarily limited to the embodiment disclosed). Neither the specification nor the file history of the '154 patent limit the methods by which pods can be removably retained in the holes. Furthermore, Claim 1 of the '154 patent requires that a substrate be "removably retained <u>in</u> one of the holes," not <u>by</u> one of the holes. Once inserted, the pods of the current InVu kit are retained in the spaces. *See* Lane Decl., at ¶¶ 16,

9

18. In addition, they are removable. *See id.*, at ¶ 18. Hence, the pods are "removably retained" and the current InVu kit infringes the '154 patent.

## IV. THE COURT SHOULD ENFORCE THE CONSENT JUDGMENT ORDER AGAINST TPO AND AWARD APPROPRIATE SANCTIONS

### A. TPO Should Be Ordered to Comply With the Provisions of the Injunction in the Consent Judgment Order

As a remedy for its violation of the Consent Judgment Order and to enforce the permanent injunction contained therein, TPO should be ordered to immediately cease production and sales of its current InVu kit. In addition, TPO should be ordered to contact its customers and distributors and instruct them to immediately return all infringing articles to TPO.

### B. TPO Should Be Monetarily Sanctioned and Should Pay 3M's Fees and Costs in Enforcing the Consent Judgment

Sanctions for civil contempt are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992); *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986). TPO's InVu kits compete directly with similar orthodontic products from 3M. *See* Lane Decl., at ¶ 20. TPO's continued infringement of the '154 patent and violation of the Consent Judgment has likely diverted sales away from 3M's patented product, causing 3M to suffer damages. *See id.* The Consent Judgment Order specifies that if TPO is found in contempt of the Order, 3M is entitled to equitable remedies, damages, and its attorneys' fees and costs incurred in enforcing the Consent Judgment. (*See* D.I. 14, at ¶ 8.) Therefore, to deter future violations of the Consent Judgment Order and to provide compensation to 3M, TPO should be sanctioned in an amount equal to the revenues received by TPO from sale of its current InVu kit.

In addition, Paragraph 8 of the Consent Judgment Order expressly provides that if TPO is found to have violated the Consent Judgment, "[i]n addition to equitable

remedies available for contempt or violation of this Consent Judgment, and/or for breach of the Settlement Agreement, Plaintiffs shall be entitled to any damages caused by TPO's contempt or violation of this Consent Judgment and to recover their attorneys' fees, costs and other expenses incurred in enforcing this Consent Judgment." Thus, TPO should also be ordered to pay 3M's fees and costs incurred in enforcing the Consent Judgment. Upon an order establishing its entitlement to recovery of its fees and costs, 3M will submit evidentiary support for the amount of its fees and costs incurred in bringing this motion.

## V. CONCLUSION

Following entry of the Consent Judgment Order, TPO made insubstantial changes to the packaging of the InVu kit and has continued to infringe the '154 patent by use of the patented invention. For the reasons stated above, 3M asks the Court to enforce the Consent Judgment Order against TPO's current InVu kit, stop TPO's ongoing infringement, and award monetary sanctions to 3M (including the fees and costs incurred in bringing this motion) under the terms of the Consent Judgment.

DATED: December 3, 2010

Respectfully submitted,

/s/ *Alexander F. MacKinnon*
Alexander F. MacKinnon
Terry Huang
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Attorneys for Plaintiffs 3M Innovative Properties Company, 3M Unitek Corporation, and 3M Company